UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**HOUSING AND RESIDENCE LIFE,
LLC,**

          **Plaintiff,**

v.                                    **Case No:  6:12-cv-874-Orl-28TBS**

**UNIVERSAL TECHNICAL INSTITUTE
OF PHOENIX, INC.,**

          **Defendant.**

---

## ORDER

On April 1, 2010,[1] Housing and Residence Life, LLC ("HRL"), the owner of a multi-family residential building ("The Palms"), entered into a contract with Universal Technical Institute (the "Institute"), a private technical vocational school with eleven campuses, including one in Orlando, Florida.  The contract, the Dormitory Services Agreement, provided that the Institute would refer all of its Orlando students in "need of dormitory style housing" to the building owned by HRL.  The Institute later entered into an agreement with Collegiate Housing Services ("Collegiate"), to refer to Collegiate its students seeking "apartments on individual . . . student leases."  HRL sued, alleging that by entering into the contract with Collegiate, the Institute breached the Dormitory Services Agreement.  The Institute has moved for summary judgment contending that

---

[1] The Dormitory Services Agreement is dated April 1, 2010, (Doc. 21-1), and both parties have stated in various documents that the parties entered into the Dormitory Services Agreement on April 1, 2010 (see First Am. Compl., Doc. 21; Answer, Doc. 22 ¶ 37).  The Institute alleged that the contract was executed on May 28, 2010 but acknowledged that the parties agreed to an effective date of April 1, 2010. (Doc. 33 at 1 n.2). Because the contract itself states April 1, 2010 as the date of its execution, the Court will assume that the contract began on April 1, 2010.

its contract with Collegiate does not cover "dormitory style housing," and in the alternative, seeking to limit damages to the date the Dormitory Services Agreement was validly terminated. Because the term "dormitory style housing" is ambiguous, the Motion for Summary Judgment (Doc. 33) must be denied, to the extent it seeks judgment on the merits of the case. But, to the extent the motion seeks to limit damages, it must be granted.

I.    Background

Under the Dormitory Services Agreement, the Institute agreed to "actively endorse [The Palms] and recommend [The Palms] as the first option to all of its students in need of dormitory style housing" and to "refer all students that have demonstrated a need for dormitory style housing to HRL" at the Institute's Orlando campus. (Id. ¶ 3). The Institute also agreed that "it will not enter into any similar agreement with any other provider of dormitory style housing, nor will it allow any other company to promote dormitory style housing to its students on its Campus . . . if such engagements interfere with HRL's ability to keep the Dorm 100% occupied." (Id. ¶ 4). HRL agreed to provide housing services in The Palms to the Institute's students and to "maintain [The Palms] in a first class, clean and orderly manner that is reasonably satisfactory to [the Institute] and its students" and to keep the quality and pricing of its services competitive in the Orlando market. (Id. ¶¶ 5-6).

In April 2010 the Institute submitted a Request for Proposals for a nationwide provider of referral services for student housing. HRL submitted a proposal but was not selected by the Institute to become its nationwide provider. The Institute instead chose Collegiate as its exclusive nationwide provider of student housing referral services,

2

beginning in March 2011. Among other requirements, Collegiate agreed to provide a service "placing [the Institute's] students in apartments on individual [Collegiate] student leases with apartment rent, basic furnishings and budgeted utilities included," (Collegiate Agreement, Doc. 28-40 ¶ 1.1), as well as providing Resident Assistants and student life events, (id. ¶¶ 1.7 & 1.9). Pursuant to the Institute's contract with Collegiate, the Institute provided Collegiate with office space at each of Institute's campuses. Though HRL had previously been granted office space and access to student databases, after Institute entered into its contract with Collegiate, the Institute informed HRL that it could no longer occupy office space on the Orlando campus or have access to student databases. Neither the grant of office space nor access to student databases was provided for in the Dormitory Services Agreement. (Doc. 21-1).

According to the Institute, after it contracted with Collegiate it continued to comply with its obligations to HRL under the Dormitory Services Agreement, enacting a Referral Process to ensure that each student who desired dormitory style housing was referred to HRL. However, after receiving complaints from students about The Palms and observing unsatisfactory conditions there, on May 25, 2012 the Institute sent HRL a letter terminating the Dormitory Services Agreement but allowing thirty days for HRL to cure its defaults. (May 25, 2012 Letter from the Institute to HRL, Doc. 28-28).[2] When HRL failed to respond to the letter within thirty days, the Institute sent HRL another letter on June 28, 2012 stating that the contract was terminated. (June 28, 2012 Letter from the Institute to HRL, Doc. 28-33).

---

[2] The May 25 letter was sent ten days after HRL sued the Institute. (Doc. 2).

Meanwhile, on May 15, 2012, HRL filed this suit, alleging that the Institute breached the Dormitory Services Agreement by contracting with a competitive company and failing to ensure that HRL was the exclusive housing provider. (Compl., Doc. 2). In November 2012, the Court granted the Institute's Motion to Dismiss and dismissed the complaint without prejudice, noting that HRL had not alleged that the Institute contracted with another to provide "dormitory style housing" and that the Dormitory Services Agreement does not require HRL to be the exclusive housing provider or have an office on campus. (Order on Mot. Dismiss, Doc. 20 at 3). HRL then filed an Amended Complaint on November 21, 2012, asserting that "'dormitory style housing' was intended to refer to a 'per bed' style of rental arrangement as opposed to an alternative arrangement wherein a student would rent an entire house, apartment or the like" and that Institute had contracted with a competitive company to provide "the same basic product" as HRL, or a service of "'per bed' rental arrangements." (Doc. 21 ¶¶ 10, 16-17). The Institute filed a Motion for Summary Judgment, which is now ripe for ruling.

## II.   Discussion

### A. Summary Judgment Standards

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). That burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

4

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, and it may not weigh evidence or determine credibility.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.' Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1261 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

B. Governing Law

The parties agreed in the Dormitory Services Agreement that the contract is governed by the law of the State of Florida. (Doc. 21-1 ¶ 19).

C. Contract Interpretation

The purpose of interpretation and construction of contracts is to determine the intent of the parties at the time they executed the contract. See Huntington on the Green Condo. v. Lemon Tree I-Condo., 874 So. 2d 1, 4 (Fla. 5th DCA 2004) ("The intent of the parties to the contract should govern the construction of a contract . . . ."); see also 11 Williston on Contracts § 30:2 (4th ed. 2012). If the meaning of a contract is unambiguous, a court must give effect to the contract as written, determining the meaning only from the contract language and without reference to any extrinsic evidence. Saregama India Ltd. v. Mosley, 635 F.3d 1284, 1290 (11th Cir. 2011); see also Williston on Contracts § 30:6. Interpretation of an unambiguous contract is generally a question of law. Lawyers Title Ins. Corp. v. JDC (Am.) Corp., 52 F.3d 1575, 1580 (11th Cir. 1995); see also Detroit Diesel Corp. v. Atl. Mut. Ins. Co., 18 So. 3d 618, 620 (Fla. 4th DCA 2009).

Contract interpretation is a question of fact "only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent." Lawyers Title Ins. Corp., 52 F.3d at 1580. Whether a contractual ambiguity exists is a question of law. Orkin Exterminating Co., Inc. v. FTC, 849 F.2d 1354, 1360 (11th Cir. 1988). A contract can be considered "ambiguous if '*reasonably susceptible* to more than one interpretation.'" Id. (emphasis added) (quoting Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chem. Corp., 684 F.2d 776, 780 (11th Cir. 1982)). "However, a true ambiguity does not exist merely because a document can *possibly* be interpreted in more than one manner." Action Nissan, Inc. v. Hyundai Motor Am., 617 F. Supp. 2d 1177, 1187 (M.D. Fla. 2008) (emphasis added).

Under Florida law, "a trial court may interpret a contract as a matter of law only when it is totally unambiguous or when any ambiguity may be resolved by undisputed parol evidence of the parties' intent." Decoplage Condo. Ass'n, Inc. v. Deco Props. & Invs., Inc., 971 So. 2d 860, 861 (Fla. 3d DCA 2007); see also Williston on Contracts § 30:7. Thus, if a contract is ambiguous, a court may consider undisputed extrinsic evidence to determine whether the evidence can resolve the ambiguity. If the extrinsic evidence cannot resolve the ambiguity, the meaning of the ambiguous terms is a question of fact that must be determined by the trier of fact and is not appropriate for summary judgment. Tingley Sys., Inc. v. HealthLink, Inc., 509 F. Supp. 2d 1209, 1215 (M.D. Fla. 2007) (citing Strama v. Union Fid. Life Ins. Co., 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001)); see also Williston on Contracts § 30:7.

D. The Parties' Arguments

The core dispute in this case is over the meaning of the term "dormitory style housing" and whether the Institute breached its contractual obligation to recommend HRL to its students as the first option for dormitory style housing and disallow other companies from promoting dormitory style housing on campus. The Institute contends that in entering into a contract with Collegiate, it did not breach the Dormitory Services Agreement. The Institute argues that according to its plain language, "dormitory style housing" means a type of housing instead of a type of leasing as alleged by HRL in the First Amended Complaint. According to the Institute, the contract term is clear and unambiguous and simply means that HRL was the first option for dormitories. Alternatively, the Institute argues that if the Court finds that the contract term is ambiguous, the Court must examine extrinsic evidence that shows there is no genuine

7

issue of material fact regarding what the parties intended the term to mean. The Institute argues that the meaning of "dormitory style housing" is determinative of whether there is a breach of the agreement. Finally, the Institute argues that it properly terminated the contract between the parties due to defaults by HRL and that therefore if the Court determines that summary judgment is not appropriate, the Institute would still be entitled to a ruling in its favor limiting damages to the period before the contract was terminated.

HRL responds that summary judgment is inappropriate because disputed material facts exist. HRL first argues that the meaning of the term "dormitory style housing" is disputed and that both HRL and Collegiate provided the same type of product, rendering the Institute's arrangement with Collegiate a violation of the Institute's contractual obligations to HRL. HRL argues that the Dormitory Services Agreement required that "students looking for a bed and not an entire apartment, house or similar housing option, would be referred to HRL" and that the Institute breached the Dormitory Services Agreement by allowing Collegiate to provide "per bed" housing services as well. (Doc. 38 at 4). Finally, HRL argues that the Institute committed a prior breach of the agreement and that therefore the Institute could not have properly terminated the contract because HRL was discharged from further contract liability once the Institute breached first.

In its reply, the Institute avers that HRL did not respond to the Institute's motion with any intrinsic or extrinsic evidence indicating that "dormitory style housing" does not mean a type of housing. The Institute also argues that even if the Institute breached the contract, HRL would not have been discharged under the agreement unless it

8

terminated the contract and stopped accepting benefits under the contract. Finally, the Institute maintains that Collegiate's housing was not similar to HRL's housing, noting that Collegiate rents out apartments complete with bathrooms, a living room, and a kitchen while HRL rents out one-room units.

    E.  <u>The Meaning of "Dormitory Style Housing"</u>

      The Dormitory Services Agreement itself does not define "dormitory style housing." It instead states that HRL "engages in the business of operating a dormitory style housing project" and that the Institute "would like to engage HRL as the housing provider for its students at the Campus in need of off campus dormitory style housing and accommodations." (Doc. 21-1). Throughout the document, HRL is referred to as a provider of "dormitory style housing." (Doc 21-1). While the contract does not define "dormitory style housing," it does make clear that the parties assumed that the property at issue in the contract was dormitory style housing. However, the contract does not explain what aspects of HRL's property make it "dormitory style." The contract also sheds no light on the questions of what is not dormitory style housing or what other types of property might be considered dormitory style housing. Dormitory style housing is reasonably susceptible of any number of meanings, including a per-bed style of rental arrangement as argued by HRL.

      The Court finds that the contract term "dormitory style housing" is ambiguous because it is reasonably susceptible to more than one interpretation. The Court cannot discern the meaning of "dormitory style housing" based on the contract alone. This finding requires examination as to whether the undisputed extrinsic evidence resolves the ambiguity or whether the case must be submitted to the trier of fact. See <u>Decoplage</u>

Condo. Ass'n, 971 So. 2d at 861. The parties have submitted several pieces of extrinsic evidence, and these submissions are addressed in turn.

### 1. Draft Agreement

In support of its proposed interpretation of "dormitory style housing," the Institute has submitted a draft of the Dormitory Services Agreement with track changes enabled to indicate the changes agreed to by both parties. (Draft of Dormitory Services Agreement, Doc. 28-24). The Institute emphasizes that the parties removed the term "exclusive" from HRL's right to provide housing to the Institute's students and inserted the term "dormitory style" in all provisions relating to the Institute's obligations to promote and refer students to HRL. (See Doc. 28-24). However, these changes to the agreement only serve to reinforce an already decided point—that the Institute was only contractually obligated to recommend the Dorm to students who need dormitory style housing. They do nothing to provide a further understanding of what the term "dormitory style housing" means.

### 2. Term Sheet

The Institute has also submitted a Term Sheet (Doc. 28-23), which the Institute states "outline[s] what both parties agreed would be the structure and general terms of the [Dormitory Services Agreement]." (Doc. 33 at 20 n.11). The Term Sheet states that the Dormitory Services Agreement was "solely for the purpose of conducting the business of operating a student dormitory." (Doc. 28-23). The Institute argues that the Term Sheet does not reference per-bed leasing and that HRL's argument that dormitories referred to a per-bed rental agreement cannot be correct. However, the Institute points to no evidence in the Term Sheet that defines "dormitory style housing"

exclusively as a type of housing not encompassed by the housing provided by Collegiate. Thus, the Term Sheet does not resolve the issue of what the parties intended the crucial phrase in the contract, "dormitory style housing," to mean.

   3. HRL's Initial Proposal for the Dormitory Services Agreement

   The third item of extrinsic evidence that the Institute relies upon is the Dorm Proposal, which was prepared for the Institute by both HRL and a related company that had a previous relationship with the Institute.   (Dorm Proposal, Doc. 28-12). The Institute argues that this document refers to dormitories and shared housing separately, indicating that they are different types of housing. The Institute also argues that HRL refers to "dormitory style housing" as actual dormitories in the proposal. While accurate, this argument only reinforces that HRL's property was dormitory style.  It does not clarify the outer bounds of the definition of dormitory style housing and does nothing to solve the central question of whether the Institute contracted with Collegiate to provide dormitory style housing in breach of the Dormitory Services Agreement.

   Only a few sections of the Dorm Proposal shed any light on what the parties may have meant by the term "dormitory style housing." (Doc. 28-12 at 6).  The section titled "Housing Programs" states that dormitories provide cost savings and are "a place where room, board, and amenities are all on-site." (Id. at 6). Later in the document, HRL states that its dormitory programs have a Housing and Residence Life Department that hosts activities for residents of the dormitory. (Id. at 9). The document also states, however, that shared housing (a separate category from dormitories) entails students sharing a room, with each student on individual leases. (Id. at 6). This undercuts HRL's argument that "dormitory style housing" is based on a per-bed rental agreement and individual

leases, since that feature is apparently possible in a shared housing arrangement as well. Nevertheless, the distinction made in this document between dormitories and shared housing does not clarify whether shared housing can be considered "dormitory style."

    4.  HRL's Bid for National Contract

    The Institute has also submitted HRL's Bid on the Institute's Request for Proposals for a nationwide contract for housing referral services. (HRL's Bid on the Institute's Request for Proposals, Doc. 28-13).   The bid focused on providing dormitories as options for student housing to all eleven of the Institute's campuses but also described a system for providing referral options to other types of housing. (Id.). The Institute notes that the bid centered on dormitories and frequently referenced the agreement with the Institute's Orlando campus; thus, the Institute argues that HRL "understood the Dormitory Services Agreement to pertain to dormitories." (Doc. 33 at 21). The Institute also argues that HRL's bid "referred to shared housing as a different type of housing than dormitory style housing." (Id. at 21).

    The bid does refer to shared apartments as a different type of housing from dormitories.  However, the bid only refers to dormitories, not "dormitory style housing." The use in the Dormitory Services Agreement of the term "dormitory style housing" clearly indicates that it encompasses more than just dormitories. Thus, it is possible that "shared housing" and "dormitory style housing" could encompass some of the same types of housing arrangements. The Court agrees that in this and other extrinsic evidence, HRL acknowledged that its property at the Institute's Orlando campus was a dormitory.  However, HRL's property being a dormitory does not exclude Collegiate's

property from being "dormitory style." This piece of extrinsic evidence does not directly address the outer limits of the term "dormitory style housing."

    5.  HRL's Marketing Materials

    The next pieces of extrinsic evidence that the Institute points to are copies of two of HRL's marketing materials—a "Housing Accommodation Comparison Chart" and a "General Housing Guide." (Housing Chart, Doc. 28-14; Housing Guide, Doc. 28-15). The chart lists a number of housing options, including dormitories and shared housing. A dormitory is described as a double occupancy room in a secured off-campus facility for students only, while shared housing is described as a double occupancy room in an apartment setting. (Doc. 28-14 at 2).  Both types of housing are listed as including the possibility of an individual lease. (Id. at 2).  The General Housing Guide lists dormitory living and shared housing separately as all-inclusive options but does not further define either option. (Doc. 28-15 at 2).

    The Institute argues that in listing dormitories as separate from shared housing in these marketing materials, HRL acknowledged that they are different types of housing. The Institute further asserts that the different descriptions of dormitories as opposed to shared housing show that "dormitory style housing" means only dorm rooms. The Institute notes that while dormitory housing is a "Double Occupancy **Room**," the description of shared housing is "Double Occupancy **in an Apartment Setting**." (Doc. 33 at 22) (emphasis added by the Institute).  However, the Institute omits a key word from the description of shared housing, which the chart states is "Double Occupancy **Room** in Apartment Setting." (Doc. 28-14 at 2) (emphasis added). When examining the difference between dormitories and shared housing, the major difference in the

definitions appears to be the setting: dormitories are located in a secured off-site facility for students only, while shared housing is in an apartment setting.

Again, the Dormitory Services Agreement's key term is "dormitory style housing," which, on its face, is broader than "dormitory." Neither the Housing Accommodation Comparison Chart nor the General Housing Guide clarifies the definition of the term "dormitory style housing." After examining both documents, it remains unclear whether Collegiate was providing dormitory style housing in violation of the Dormitory Services Agreement.

6. Emails from the Institute

HRL has submitted emails from Tiffany Johnson, an employee of the Institute,[3] that state that HRL's property was "previously called dorms [but is] now referred to as shared housing." (Ex. 1 to Doc. 38). HRL contends that this communication undercuts the Institute's argument that HRL's property was not shared housing similar to housing provided by Collegiate. HRL further argues that this documentation shows a factual dispute as to both the definition of "dormitory style housing" and its application to the housing services provided by HRL and Collegiate. In its reply, the Institute does not address this document. Viewing this evidence in the light most favorable to the nonmoving party, this email exchange suggests that "dormitory style housing" as used in the Dormitory Services Agreement and shared housing as provided by Collegiate may not be as dichotomous as the Institute suggests. This supports HRL's argument

---

[3] Tiffany Johnson's signature indicates that she is the Campus Admissions Director at the Motorcycle Mechanics Institute, which is mentioned along with the Institute in several documents submitted by the parties. HRL alleges that Ms. Johnson is an employee of the Institute, and the Institute does not object.

that the services Collegiate provided could be within the scope of the Dormitory Services Agreement.

### 7.  Dictionary Definition

It is well-accepted that courts can interpret contracts by determining the plain meaning of language through reference to dictionaries.  See, e.g., Penzer v. Transp. Ins. Co., 29 So. 3d 1000, 1005-08 (Fla. 2010); Beans v. Chohonis, 740 So. 2d 65, 67 (Fla. 3d DCA 1999). HRL cites a dictionary definition of dormitory as "a building, as at a college, containing a number of private or semi-private rooms for residents, usually along with common bathroom facilities and recreation areas." (Doc. 38 at 6).  HRL argues that its property "is not a dorm" because it does not provide housing with shared bathroom areas and is not located on campus. HRL argues instead that "there is no precise definition for 'dormitory style[,]' . . . creating a factual dispute to be determined by the trier of fact." (Id. at 6). The Institute counters that the definition used by HRL shows that the term dormitory describes a type of housing, not a type of leasing.

In determining whether the term "dormitory style housing" is ambiguous, the Court consulted another dictionary source. Merriam-Webster Dictionary defines dormitory as "a room for sleeping; *especially*: a large room containing numerous beds" and "a residence hall providing rooms for individuals or for groups usually without private   baths."         Dormitory,    Merriam-Webster,    http://www.merriam-webster.com/dictionary/dormitory (last visited Aug. 15, 2013).

Neither of the dictionary definitions fully answers the question of the meaning of dormitory style housing. Defining the term "dormitory" does not fully define the meaning of the phrase "dormitory style housing," which was obviously intended to include a

broader array of housing than simply dormitories. The first definition in Merriam-Webster may tend to support HRL's version of the definition of "dormitory style" in that "a large room containing numerous beds" contemplates an arrangement of renting out a bed. However, the Institute's argument that HRL's dictionary definition of "dormitory" contemplates a type of housing, not a type of leasing arrangement, is well-taken; the dictionary definitions support the Institute's argument that the term implies a type of housing. Clearly, however, neither definition is completely accurate in describing HRL's property. Because HRL's property was clearly intended to be considered "dormitory style," the intention of the parties must have been broader than the definitions in the dictionary.

8. Conclusion as to the Meaning of "Dormitory Style Housing"

In sum, the Institute has not produced an intrinsic or extrinsic definition of "dormitory style housing" that satisfactorily resolves the ambiguity in the term. Accordingly, there remains a genuine issue of material fact for the jury, and summary judgment is not appropriate on the issue of the meaning of this disputed contractual term.

F.  Limitation of Damages

The Institute also argues that even if the Court determines that summary judgment is inappropriate as to the merits of HRL's claims, the Institute is entitled to a ruling limiting damages because it properly terminated the agreement on May 25, 2012. HRL argues in response that due to the Institute's alleged prior breach of the contract, HRL had no further obligations under the contract.  As established above, whether the Institute breached the contract is a question of fact for the jury to determine. However,

the Institute argues that even if the Institute breached the contract, HRL must have affirmatively terminated the contract in order to be discharged from its obligations.

The general rule upon one party's breach of contract is that "the non-breaching party [may] treat the breach as a discharge of his contract liability." Bradley v. Health Coal., Inc., 687 So. 2d 329, 333 (Fla. 3d DCA 1997). However, one party cannot stop performance because of an alleged breach while continuing to accept the contract's benefits. See Dunkin' Donuts Franchised Rests. LLC v. D & D Donuts, Inc., 566 F. Supp. 2d 1350, 1360 (M.D. Fla. 2008). A material breach

> merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. . . . If he elects to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

Dunkin' Donuts of Am., Inc. v. Minerva, Inc., 956 F.2d 1566, 1571 (11th Cir. 1992) (quoting Cities Serv. Helex, Inc. v. U.S., 543 F.2d 1306, 1313 (Ct. Cl. 1976)).

The Dormitory Services Agreement provides that in the event of a refusal or failure to perform the contract's obligations, or in the event of another material default, the non-breaching party must provide the breaching party thirty days' notice and opportunity to cure. (Doc. 21-1 ¶ 10.2). If the breach is not remedied, the non-breaching party may validly terminate the agreement. (Id.). However, the Institute "reserve[d] the right to terminate [the] agreement for failure to maintain student satisfaction levels." (Id. ¶ 10.3). The Institute asserts that HRL failed to maintain student satisfaction levels. The Institute's evidence on this point is compelling. (See Summary of Survey Results,

Doc. 28-31) (indicating that overall, more than 90% of students were dissatisfied or very dissatisfied with their experience living at The Palms).

HRL does not allege in its pleadings inaccuracy in the results of the Student Survey, nor does it attempt to argue that its actions did not result in a "failure to maintain student satisfaction levels" pursuant to the contract.  Instead, HRL argues that the Institute was the first party to breach the Dormitory Services Agreement and that HRL could thus treat its contractual obligations as discharged.  However, HRL did not "treat the breach as a discharge of [its] contract liability."  The Institute argues, and HRL does not dispute, that HRL "continued to accept benefits under the contract" after the alleged breach.  (Doc. 41 at 4).  Furthermore, Richard Aaron Thomas, a principal of HRL, admitted that HRL "still had obligations on its . . . contract" after HRL filed the lawsuit. (Thomas Dep. at 111:4-5). HRL did send a letter to the Institute informing the Institute that it viewed the Institute's relationship with Collegiate as a breach of the Dormitory Services Agreement, but this letter did not terminate the Dormitory Services Agreement; instead, it stated that HRL "will continue to honor its contractual obligations."  (See Ex. B to Rucki Aff. at 12-13).

The evidence shows that HRL elected to continue the contract after the Institute's alleged breach and that the Institute terminated the contract with its May 25 letter. Thus, the Institute is entitled to partial summary judgment limiting HRL's damages to any damages before the Institute validly terminated the agreement on May 25, 2012.

### III.   Conclusion

There remains a genuine dispute of material fact regarding whether the Institute breached the Dormitory Services Agreement with HRL. However, HRL's damages, if

any, are limited to damages incurred before May 25, 2012, when the Institute validly terminated the contract.

Accordingly, it is **ORDERED** and **ADJUDGED** that the Institute's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, as set forth herein.

**DONE** and **ORDERED** in Orlando, Florida on August 23, 2013.

JOHN ANTOON II
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties

19